US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

# UNITED STATES DISTRICT COURT

for the
Western District of Arkansas
Fort Smith Division

JAN 2 7 2023

In the Matter of the Search of )
)
Premises located at )
6999 Free Ferry Road )
Fort Smith, Arkansas 72903 )

Case No. 2:23-10

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property: **Premises located at 6999 Free Ferry Road, Fort Smith, Arkansas 72903, more particularly described on Attachment A.**

located in the Western District of Arkansas, there is now concealed *(identify the person or describe the property to be seized)*: **See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

√  evidence of a crime;

☐  contraband, fruits of crime, or other items illegally possessed;

☐  property designed for use, intended for use, or used in committing a crime;

☐  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(l) | Unlawful Importation of Firearms |
| 18 U.S.C. § 554 | Unlawful Exportation of Merchandise |
| 13 U.S.C. § 305(a)(1) | Submitting False or Misleading Export Information Through the Automated Export System for collecting Electronic Export Information |
| 26 U.S.C. § 7201 | Attempt to Evade or Defeat Tax |
| 26 U.S.C. § 7206(1) | False Return, Statement or Document |
| 18 U.S.C. § 1503 | Corruptly Obstructing or Impeding the Due Administration of Justice |
| 18 U.S.C. § 1512(c) | Corruptly Altering, Destroying or Concealing A Record, Document or other Object with Intent to Impair the Objects' Integrity or Availability for Any Official Proceeding |
| 18 U.S.C. § 371 | Conspiring to Commit an Offense Against The United States or to Defraud the United States |

The application is based on these facts:

√  Continued on the attached sheet. **Affidavit of FBI Special Agent George Handey.**

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

George Handey, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/27/23

_____
*Judge's signature*

City and state: Fort Smith, Arkansas

Mark E. Ford, United States Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF A WARRANT TO SEARCH AND SIEZE**</u>

I, FBI Special Agent George Handey, being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION

**A.   Purpose**

      1.     This affidavit is made in support of search warrants for the PREMISES located at the addresses listed below (hereinafter, "PREMISES," further described in the Attachment A as to each of the two applications to which this affidavit is appended), for the items to be seized described in Attachment B. PREMISES II is the business locations for Federal Armament LLC (Federal Armament)/FSAAP LLC, and PREMISES I is the residence of Neil Ravi Mehta (hereinafter, "MEHTA"), the owner and Chief Financial Officer (CFO) of Federal Armament.

            a.     PREMISES I:  6999 Free Ferry Road, Fort Smith, Arkansas 72903;

            b.     PREMISES II:  5730 North 6th Street, Fort Smith, Arkansas 72904;

      2.     This is a joint investigation involving the following federal law enforcement agencies:

            a.     The Federal Bureau of Investigation (FBI).

            b.     The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).

            c.     The U.S. Department of Commerce (DOC), Bureau of Industry and Security (BIS), Office of Export Enforcement (OEE).

            d.     Internal Revenue Service-Criminal Investigation (IRS-CI).

            e.     The U.S. Department of Labor, Office of the Inspector General (DOL-OIG).

      3.     The facts set forth in this affidavit are based upon my training and experience, the training and experience of other agents and investigators involved in this investigation including those whose background and expertise are set forth in the "Agents' Background" section, and information obtained from my own investigation and that of other agents involved in this joint

investigation. Agents listed in the "Agents' Background" section have assisted in the preparation of this Affidavit and have confirmed to Affiant the accuracy of the information that relates to their areas of investigation and expertise, specifically ATF Special Agent Tyler Cowart as it relates to firearms violations, DOC-BIS-OEE Special Agent Todd Marr as it relates to export violations, IRS-CI Special Agent John Munns as it relates to federal tax violations, and DOL-OIG Senior Special Agent William Griffitt as it relates to the obstruction of justice violations.

4.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of the facts known to investigators. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts are alleged to be approximate, and all dates and times are "on or about" or "in or about" those indicated.

**B.     Agents' Backgrounds**

5.     Affiant, George Handey, is a is a Special Agent with the Federal Bureau of Investigation (FBI), and has been so employed since July 2018. SA Handey is currently assigned to the FBI Little Rock Joint Terrorism Task Force. As part of his duties as an FBI agent, Special Agent Handey has investigated national security matters related to domestic and international terrorism. Special Agent Handey received basic training at the FBI Academy in Quantico, Virginia. Special Agent Handey gained training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, the exploitation of lawfully obtained evidence and data, and various other procedures. As a Special Agent, SA Handey is authorized by law or by a government agency to engage in or supervise the prevention, detention, investigation, or prosecution of a violation of federal criminal laws. Special Agent Handey is also a licensed attorney. Special Agent Handey is a "federal law enforcement

officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

6.      Tyler Cowart is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United Stated Department of Justice, and has been so employed since January 2017.  Special Agent Cowart is a graduate of the Federal Law Enforcement Training Center (FLETC) and the ATF National Academy and is currently assigned to the Little Rock Field Office.  Prior to Special Agent Cowart's employment with ATF, he was employed as a Probationary Police Officer with the Kansas City Missouri Police Department for six months. Special Agent Cowart received a Bachelor of Science degree in Criminal Justice (with a minor in Biology) from Missouri Western State University.  As a Special Agent with the ATF, Special Agent Cowart is vested with the authority to investigate violations of federal laws, including those firearms violations set forth in Titles 18 and 26 of the United States Code.  Special Agent Cowart has investigated numerous cases related to the unlawful transfer to and possession of firearms by prohibited persons, persons transferring and receiving firearms unlawfully, theft of firearms and interstate carriers, possession of stolen firearms, and persons unlawfully converting/altering firearms to fall under the purview of the National Firearms Act (NFA).

7.      Todd Marr is a Special Agent with the U.S. Department of Commerce, Bureau of Industry and Security, Office of Export Enforcement, and has been so employed since April 2002. As a part of his duties, Special Agent Marr is empowered by law to investigate and make arrests for offenses involving the unlawful export of goods and technology to destinations outside the United States.  Prior to becoming an OEE Special Agent, Special Agent Marr was employed as a statistician for the U.S. Census Bureau from June 1997 through April 2002.  Special Agent Marr

graduated from the Federal Law Enforcement Training Center (FLETC) in June 2003. Special Agent Marr obtained a Bachelor of Arts degree in Economics from the University of Maryland at College Park in 1995, a Master of Science degree in Business Administration from University of Maryland (University College) in 2001, and a Master of Science degree in National Security and Strategic Planning from the Naval War College in 2016. Special Agent Marr is also a graduate of the College of Naval Command and Staff. Special Agent Marr's current responsibilities include investigating the illegal transfer and export of commodities, technology, and services from the United States, which are regulated by the DOC. Special Agent Marr has conducted and participated in numerous investigations of criminal activity, including the investigation of export violations.

8.      John Munns is Special Agent with IRS-CI, and has been so employed since 2011. Currently, Special Agent Munns is assigned to the Fayetteville, Arkansas, Post of Duty, in the Dallas Field Office. Special Agent Munns has investigated various financial crimes, including tax violations under Title 26 of the United States Code; money laundering under Title 18, Sections 1956 and 1957 of the United States Code; and wire and bank fraud, under Title 18, Sections 1343 and 1344 of the United States Code. During this time, Special Agent Munns has authored and reviewed affidavits for search and seizure warrants, led and coordinated the execution of search, seizure, and arrest warrants, conducted surveillance, analyzed records related to fraud schemes and worked with various other local and federal law enforcement officers regarding such activities.

9.      Prior to employment with IRS-CI, Special Agent Munns was employed with IRS's Small Business/Self Employed Examination Division as a Revenue Agent from 2006 to 2011. During this time, Special Agent Munns conducted independent examinations and related investigations of income tax returns that covered a diverse spectrum of both individual and

business taxpayers (e.g., corporations, partnerships, and limited liability companies). Examinations often involved special audit features covering varying and complex accounting, tax law and other regulatory issues. Examinations often covered complex individual and business taxpayers involved in activities, transactions or organizations designed or structured to hide or conceal income and/or related financial transactions both domestically and offshore. Special Agent Munns routinely examines various accounting and bookkeeping systems, including computerized accounting and financial information systems which reflect a variety of complex financial operations. Special Agent Munns obtained a Bachelor of Science degree in Accounting from Arkansas State University in 2005.

10. William Griffitt is a Senior Special Agent with the U.S. Department of Labor, Office of Inspector General, Office of Investigations – Labor Racketeering and Fraud, and has been a Special Agent with this agency since 2002. Currently, Senior Special Agent Griffitt is responsible for investigating violations of certain criminal statutes contained within Title 18 of the United States Code, including crimes related to fictitious employer schemes, obstruction, unemployment fraud, identity theft, fraud through electronic media, mail fraud, and theft in general. Senior Special Agent Griffitt is authorized to apply for and execute search warrants and arrest warrants for offenses enumerated in Title 18 of the United States Code. Senior Special Agent Griffitt has participated in and directed investigations involving various types of fraud and, as a result of Senior Special Agent Griffitt's training and experience, Senior Special Agent Griffitt is familiar with the tactics, methods, and techniques of committing these various types of fraud related violations of federal law.

## II.    PROBABLE CAUSE

### A.    Summary

11.    Based on the facts set forth in this affidavit, I submit that there exists probable cause to believe that Neil MEHTA and others conspired to commit and aided and abetted each other in committing the following criminal offenses:  Unlawful Importation of Firearms in violation of 18 U.S.C. § 922(l); Unlawful Exportation of Merchandise in violation of 18 U.S.C. § 554; Submitting False or Misleading Export Information through the Automated Export System (AES) for collecting Electronic Export Information (EEI), in violation of 13 U.S.C. § 305(a)(l); Attempt to Evade or Defeat Tax, in violation of 26 U.S.C. § 7201; False Return, Statement or Document, in violation of 26 U.S.C. § 7206(1); Corruptly Obstructing or Impeding the Due Administration of Justice, in violation of 18 U.S.C. § 1503; Corruptly Altering, Destroying or Concealing a Record, Document, or other Object with Intent to Impair the Objects' Integrity or Availability for Any Official Proceeding, in violation of 18 U.S.C. § 1512(c); and Conspiring to Commit an Offense Against the United States or to Defraud the United States, in violation of 18 U.S.C. § 371.

12.    Based upon the analysis of records, interviews conducted and other investigation, there exists probable cause to believe that records and evidence relating to such activities are stored and maintained on PREMISES I and II.

### B.    Applicable Forfeiture Principals

13.    Title 18 U.S.C. § 981 governs the procedures in civil forfeiture, and subsection (a)(1)(C) provides that any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)) is subject to forfeiture. Unlawful Importation of Firearms in violation of 18 U.S.C. § 922(l) is "specified unlawful activity" pursuant to 18 U.S.C. § 1956(c)(7)(D).

Additionally, 18 U.S.C. § 924(d) provides that any firearm or ammunition involved in or used in any knowing violation of 18 U.S.C. § 922(l) shall be subject to seizure and forfeiture.

14.     Property subject to civil forfeiture may be seized pursuant to 18 U.S.C. § 981(b). Title 18 U.S.C. § 981(b)(3) provides that "a seizure warrant pursuant to this subsection may be issued by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found." Title 28 U.S.C. § 1355(b)(1)(A) provides that a forfeiture action may be brought in "the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred."

15.     Title 28 U.S.C. § 2461(c) provides that the Government may seek criminal forfeiture whenever an Act of Congress provides civil forfeiture, and that 21 U.S.C. § 853 apply to all stages of the criminal forfeiture proceeding.

16.     Title 21 U.S.C. § 853(f) provides that the "Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant." Title 21 U.S.C. § 853(l) states that "district courts of the United States shall have jurisdiction to enter orders as provided in this section without regard to the location of any property which may be subject to forfeiture."

C.     **Persons and Entities**

17.     NEIL RAVI MEHTA is 30 years of age, a U.S. citizen, and has served as chief financial officer for Federal Armament since 2014. MEHTA resides at 6999 Free Ferry Road, Fort Smith, Arkansas 72903.

18.     Federal Armament is a company engaged in the domestic sale within the United States and exporting to foreign countries, of ammunition, gun magazines, pistols, shotguns, rifles,

body armor, and other defense equipment via direct sales to customers, dealers, and distributors. Federal Armament is headquartered at 5730 North 6th Street, Fort Smith, Arkansas. Federal Armament was established in 2014 and was a privately owned company, owned by XN Capital, which is wholly owned by MEHTA.

19.    FSAAP LLC (FSAAP) was incorporated with the Arkansas Secretary of State on or about June 10, 2021. FSAAP is headquartered at 5730 North 6th Street, Fort Smith, Arkansas. Federal Armament notified the State of Arkansas, Arkansas Department of Workforce Services (ADWS), on or about December 31, 2021, that it was terminating its account because they were bought by FSAAP. FSAAP filed with the State of Arkansas, ADWS, a liability date of ownership starting on January 1, 2022. FSAAP has maintained approximately 19 employees for 2022 with an average quarterly wage payments of $146,000. On December 14, 2022, MEHTA told Special Agent Cowart that FSAAP had not done any business yet, but all employees were employed as FSAAP currently.

20.    XN Capital has an entity registration date with the IRS on or about April of 2011, with MEHTA listed as the sole owner/member. XN Capital was registered with the Arkansas Secretary of State on or about April 4, 2019, as a Domestic Limited Liability Corporation. XN Capital is listed as the sole owner (100%) of Federal Armament.

21.    There is probable cause to believe that Mark Bailey (BAILEY) is a fictitious name used by MEHTA. BAILEY was purportedly the Operations Manager for Federal Armament since 2014. The Arkansas Department of Workforce Services does not have any reporting of wages for BAILEY by Federal Armament nor FSAAP.

22.     Jaden Chace Smith (SMITH) is 31 years of age, a U.S. citizen, and served as sales manager for Federal Armament from 2018 to on or about December of 2022. SMITH purports to be a 50% owner of FSAAP.

23.     Eric Woodhouse (WOODHOUSE) is 34 years of age, a U.S. citizen, and served as purchasing manager and/or production engineer. WOODHOUSE purports to be a 50% owner of FSAAP.

24.     Winfred Daniela Marine (MARINE) is 31 years of age, a U.S. citizen, and has been employed with Federal Armament since July 2022. MARINE resides in Fort Smith, Arkansas.

25.     XNFS INC (XNFS) is a Wyoming corporation licensed to do business in Arkansas. According to Arkansas Secretary of State records, XNFS filed its application for a Certificate of Authority on March 18, 2022. The filing signature listed Joanna Haynes, an employee of Federal Armament, as the Incorporator/Organizer. XNFS listed its address as 21 North P Street, Fort Smith, Arkansas 72901, which is the location of a warehouse owned by Federal Armament. The Arkansas Secretary of State issued XNFS a Certificate of Authority on December 10, 2021. On September 14, 2021, Joanna Haynes filed with the Arkansas Secretary of State a Notice of Change of Registered Office or Agent, changing the XNFS registered agent to Federal Armament, 5730 N 6th St, Fort Smith, Arkansas 72901; phone 479-431-6392, email: office@fedarm.com.

**D.     Additional Facts Establishing Probable Cause as to Unlawful Importation of Firearms.**

26.     As set forth in detail below there is probable cause to believe that Federal Armament, MEHTA, WOODHOUSE, and others have unlawfully imported firearms and conspired to unlawfully import firearms by falsely representing on ATF forms that Federal Armament was importing model firearms approved for importation by ATF when in fact Federal Armament was importing firearms not approved for importation.

### i.  Relevant Statutes and Regulations Relating to the Importation of Firearms

27.    Title 18 U.S.C. § 922(l) states, "[e]xcept as provided in section §925(d) of this chapter, it shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violations of the provisions of this chapter." Pursuant to 18 U.S.C. § 924(a)(1)(C), "whoever knowingly imports or brings into the United States or any possession thereof any firearm or ammunition in violation of section 922(l) shall be fined under this title and imprisoned for not more than five years, or both."

28.    Title 18 U.S.C. § 925(d) provides that the attorney general shall authorize a firearm or ammunition to be imported or brought into the United States or any possession thereof if the firearm or ammunition:

    (1)  Is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to chapter 401 of Title 10,

    (2)  Is an unserviceable firearm, other than a machinegun as defined in §5845(b) of the Internal Revenue Code of 1986 (not readily restorable to firing condition), imported or brought in as a curio or museum piece,

    (3)  Is a type that does not fall within the definition of a firearm as defined in §5845(b) of the Internal Revenue Code of 1986 and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military firearms, except in any case where the Attorney General has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled; or

    (4)  Was previously taken out of the United States or a possession by the person is bringing in the firearm or ammunition.

29.     Firearms are imported into the United States of America via an application and Permit for Importation of Firearms, Ammunition, and Defense Articles. This Permit (ATF Form 6) is generally needed to import defense articles into the United States. The ATF Firearms and Explosives Imports Branch (FEIB) reviews and processes ATF Forms 6. When the FEIB is uncertain as to whether the type of firearm described in the ATF Form 6 is importable, it conditionally approves the importation of one such firearm to the ATF Firearms Technology Industry Services Branch (FTISB) which is responsible for determining if the firearm is particularly suitable for or readily adaptable to sporting purposes and therefore importable. After examining the firearm, the FTISB notifies the applicant whether the firearm is importable or not in a written evaluation. If the firearm is not importable, the firearm must be returned to the exporter or destroyed within a foreign trade zone (FTZ) or abandoned to ATF.

30.     If the firearm is importable, FEIB returns the ATF Form 6 to the FFL along with two blank ATF Forms 6A, which are used to obtain a release from the U.S. Customs and Border Protection (CBP) and to notify ATF of actual importation of firearms imported pursuant to an approved ATF Form 6. Multiple shipments of the approved firearm, subject to the number permitted and time frame granted on the approved ATF Form 6, may be made. Each shipment received is to be reported to FEIB by the FFL via an ATF Form 6A.

31.     In addition to the ATF Forms 6 and 6A which are required to obtain the release of firearms, firearms parts, or ammunition, 27 CFR §§ 447.45(a) and 478.112(c) require Federal firearms licensed (FFLs, Types "08" or "11") importers to also present Customs and Border Patrol (CBP) officials with a copy of the export license authorizing the exportation of the articles from the exporting country. If the exporting country does not require the issuance of an export license, the FFL instead must present a certification, signed under penalties of perjury, to that effect.

32.     If the FFL is not present at the port of entry when firearms approved for importation are received, CBP will notify the FFL importer permittee of the arrival of the defense article(s) and provide the FFL with the port location.  The FFL will then have the opportunity to decide whether to have the articles shipped to the licensed premises or if the FFL wants to travel to the port and take physical possession of the articles.  If the FFL will not take physical possession of the article, but instead would like a person who is not prohibited from possessing firearms, to obtain the article(s) on the FFL's behalf, the FFL must provide that person with:  (1) a copy of the approved Form 6; (2) a copy of the completed Form 6A; (3) the export license (if the FFL is Type "08" or "11"); and, (4) a letter signed by the FFL authorizing the person to take possession of the articles on the FFL's behalf.  If the FFL decides to have CBP ship the articles to the licensed premises (postage paid upon receipt), the FFL must provide CBP with items (1) through (3) above.

33.     Licensed importers (FFLs types 08 and 11) are required pursuant to 27 CFR §§ 478.92 and 479.102 to conspicuously engrave each imported firearm frame, or receiver with: (1) your name and address as the importer of record; (2) caliber or gauge, (3) model designation; (4) the name of the manufacturer and country in which manufactured on each imported firearm if it did not bear such; and, (5) a unique serial number.  A recognized abbreviation of same may use to identify the names.

34.     Pursuant to 27 CFR § 478.112, each importer and manufacturer must, within 15 days after defense articles are released from CBP custody, complete Section I of ATF Form 6A and forward it to ATF FEIB, 244 Needy Road, Martinsburg, West Virginia 25405, (304)616-4550.  Licensed importers must also complete and sign Section II of the Form 6A.

## ii. Federal Armament and FSAAP Federal Firearms Licenses

35.     On or about July 4, 2014, Federal Armament was issued a Type 7 Federal Firearms License allowing it to manufacture firearms other than destructive devices and a Type 8 Federal Firearms License allowing it to import firearms or ammunition for firearms other than destructive devices or ammunition other than armor piercing ammunition. The premises address for both licenses was originally 5701 S 73rd Place, Fort Smith, Arkansas 72904 but moved to 5730 N. 6th Street, Fort Smith, Arkansas 72904 in 2017, PREMISES II. MEHTA was listed as a responsible person on both licenses with the title "CFO." Jared Hayes with title "Production Plant Manager" was initially listed as a responsible person on both licenses but was subsequently deactivated from the licenses and replaced on the Type 7 license by MARINE with title "Shipping Mgr" and on the Type 8 license by WOODHOUSE with title "Purchasing Manager." Federal Armament also has 2 explosives licenses.

36.     On July 12, 2022, FSAAP was issued Type 7 and Type 8 Federal Firearms Licenses listing 5730 N. 6th Street, Fort Smith, Arkansas 72904, PREMISES II, as the premises address. SMITH, with the title Sales Manager-Member, and WOODHOUSE, with the title Purchasing Manager-Member, were listed as responsible persons for both licenses.

## iii. Application and Importation of Firearms by Federal Armament

37.     On or about January 18, 2016, MEHTA, as CFO and Owner of Federal Armament, signed and subsequently submitted an ATF Form 6 application seeking to import 21 different models of firearms including 35,000 FedArm TK, Model FRN, 12-gauge shotguns. ATF conditionally approved the importation of one of each of the 21 different types of firearms including a FedArm TK, Model FRN, 12-gauge shotgun for examination and determination by FTISB as to the importability of these firearms. On or about August 16, 2016, Federal Armament

sent to FTISB 14 of the 21 different types of firearms on its ATF Form 6 including a FedArms TK, Model FRN, 12-gauge pump-action, shotgun with serial number 16-HG 50506.

38.     By letter addressed to WOODHOUSE at Federal Armament and dated September 19, 2016, FTISB notified Federal Armament that a FedArms TK, Model FRN, 12-gauge pump-action, shotgun with serial number 16-HG 50506 was not a model shotgun that was importable as a sporting weapon because the magazine capacity exceeded five (5) rounds.  On October 1, 2016, MEHTA responded to an ATF email referencing the fact that the FedArms TK, Model FRN, 12-gauge pump-action, shotgun had not been approved for importation and attempted to arrange for the firearm to be returned to its country of origin, Turkey.  MEHTA further stated in the email that an air cargo shipment arriving two weeks later would have a new lower capacity FRN, 12-gauge pump-action, shotgun.  MEHTA stated that he knew that this would require renaming the FRN, 12-gauge pump-action, shotgun because the original one submitted had been determined to be non-importable.

39.     On November 10, 2016, Federal Armament resubmitted to FTISB a FedArms TK 12-gauge pump-action shotgun with serial number 16-5 10003, which had been altered from the original submission to reduce the magazine capacity to not exceed five (5) rounds.  By letter addressed to WOODHOUSE at Federal Armament and dated January 11, 2017, FTISB notified Federal Armament that the resubmitted FedArm TK, 12-gauge pump-action shotgun with serial number 16-5 10003 now renamed as Model FRN-12 was approved for importation as the magazine capacity for the resubmitted shotgun did not exceed five (5) rounds.

40. Following are photos of the two shotguns (the originally submitted Model FRN and the resubmitted Model FRN-12) taken by FTISB and included in the FTISB correspondence with Federal Armament. The magazine tube which is located below the barrel and forward of the receiver on each shotgun, is longer on the shotgun with a magazine capacity exceeding five (5) rounds which was not importable.

FRN (12 gauge) vs FRN-12

FedArm TK, Model FRN, 12 gauge pump-action shotgun, serial number 16-HG 50506



Model FRN (12 gauge) was determined to be non-importable by FATD on 9/16/2016. (Exhibit 1)

FedArm TK, Model FRN-12, 12 gauge pump-action shotgun, serial number 16-F 10003



Model FRN-12 (12 gauge) was determined to be importable by FATD on 1/17/2017. (Exhibit 2) Note: This firearm is manufactured by FedArm TK.

41. On or about April 8, 2021, WOODHOUSE, as purchasing manager for Federal Armament, digitally signed and subsequently submitted an ATF Form 6 application to import to Federal Armament several different models of firearms including 10,000 FedArm TK[1] Model

---

[1] In both ATF Forms 6 and 6A submitted related to the importation of firearms in 2021, the top of the form describes the firearms as FedArms TK "previously known as a Berika Arms," but in other

FRN-12, 12-gauge shotguns which FTISB had previously approved as importable by letter dated January 11, 2017, as detailed above. On or about September 20, 2021, Federal Armament submitted an ATF Form 6A acknowledging that Federal Armament had imported various approved firearms including 380 FedArm TK model FRN-12, 12-gauge shotguns and listing the serial numbers for these shotguns, including a shotgun with serial number B21PA0094.

### iv.    Compliance Inspection of Federal Armament by ATF

42.    On or about February 7, 2022, ATF Industry Operations Investigators (IOI) conducted a compliance inspection of Federal Armament.[2] One of the primary operations of Federal Armament is the importation of shotguns that are wholesaled to other FFLs. During the initial inventory, certain models of the imported shotguns did not appear to have serial number markings that met the required depth. Senior Investigators requested Federal Armament ship one shotgun from two different model shotguns to Firearms and Ammunition Technology Division (FATD) to evaluate whether the shotguns were properly marked.

43.    One of the shotguns sent for evaluation was the shotgun with serial number B21PA0094 which was one of the 380 shotguns imported as a FedArm TK Model FRN-12, 12-gauge shotguns as reflected on the ATF Form 6A signed by WOODHOUSE on September 20, 2021. On April 1, 2022, the shotguns were received by FATD.

44.    On April 26, 2022, a Senior Industry Operations Investigator was informed via telephone and later by email that although the serial number on the two tested models met the minimum required depth, the importer markings did not meet the minimum required depth.

---

parts of the document the firearms are referred to as FedArms TK without the "previously known as Berika" language.

[2] The compliance inspection that began in February 2022 and continued in December 2022 related only to Federal Armament.

Because the importer markings were placed by the manufacturer in Turkey and because the method is usually set at specific parameters, it was likely that many of the model shotguns that were examined by FATD and possibly other models do not meet the minimum depth requirement on the importer markings.

45.     FATD also determined that both models submitted had non-sporting features that make them ineligible for importation. Specifically, flash suppressors and extended magazine tubes that held over five rounds. FATD records indicated that the shotguns sent in by Federal Armament for evaluation prior to importation and for which importation was approved did not show these features. After learning of this situation, a Senior Investigator reviewed models of shotguns on Federal Armament's website (www.fedarm.com) and discovered that additional models also have an extended magazine tube. FATD determined that the model of the firearms submitted for evaluation and approved for importation in 2017 did not have the extended magazine tube.

46.     On April 27, 2022, a Senior Industry Operations Investigator confirmed with SMITH that no features were added to any of the firearms after they arrived at Federal Armament, and the firearms remained in the configuration in which they were imported. Since FATD could not make an evaluation whether additional firearms where improperly marked and/or imported without physically seeing the firearms, Senior Industry Operations Investigators requested field assistance from FTISB.

47.     From December 12, 2022, through December 15, 2022, Firearms Enforcement Officers (FEO) with Firearms Technology Industry Services Branch (FTISB), assisted a team of IOIs on site at Federal Armament in physically inspecting the imported firearms for importability and/or marking issues. As a result of that on-site examination, the inspection team identified a total of 3,171 firearms as listed in attachment B that were unlawfully imported because they were

non-importable and should have never been imported due to issues such as having features such as flash hiders/suppressors, magazine capacities greater than five rounds, or not being in the same configuration as similar models that had been approved for importation, or had non-compliant marking depths. On December 13, 2022, WOODHOUSE was asked about the non-importable features found on firearms at Federal Armament and stated to the Senior Industry Operations Investigator, "We don't really check those things. They package and ship over there and we don't look." In addition, most of the contraband firearms had importation and/or serial number markings that did not meet the required depth or were painted/screen-printed onto the firearms.

48.     The 3,171 contraband firearms, either illegally imported by Federal Armament or with non-compliant marking depths, were palletized, shrink-wrapped, and labeled with placards and red tape stating ATF Hold. Federal Armament's responsible parties on the license, MEHTA, WOODHOUSE, and MARINE were told by IOI Investigators not to do anything with these firearms until contacted by ATF with instructions.

49.     Special Agent Cowart believes, based on his training and experience and knowledge of this investigation, there is probable cause that:

a.     Federal Armament has been unlawfully importing firearms not approved for importation by falsely representing on ATF Form 6As that non-importable firearms are firearms that Federal Armament has received approval to import and that 3,171 contraband firearms that were either unlawfully imported or with non-compliant marking depths, will be located at PREMISES II.

b.     Records relating to the ownership, control and operation of Federal Armament, and the importation and disposition of imported firearms including emails, text messages and other communications involving MEHTA, WOODHOUSE, employees,

customers, suppliers and/or regulators of Federal Armament will be found at PREMISES I and II, and that such records and communications are evidence tending to establish those individuals responsible for and involved in the unlawful importation of firearms by Federal Armament.

**v.   Additional Contraband Items Located and Seized**

50.    On December 14, 2022, IOI inspectors along with FTISB specialists located the following additional items believed to be contraband at Federal Armament: (a) VSS Rifle, Hallyon Defense, VSS Vientorez, 9x39mm caliber rifle, serial number: VSS-001, believed to be a KPV Machine Gun Receiver, bearing serial number: 6A128; (b) 60mm Mortar Tube; (c) Bulgarian, RPG-7B, serial number: BE-34-321; and d) NR-23 Internal Locking Piece cut/de-milled.  IOI Investigators contacted Special Agent Cowart regarding the alleged contraband items.  Special Agent Cowart met the Inspectors along with WOODHOUSE.  Special Agent Cowart asked WOODHOUSE if the alleged contraband items belonged to him.  WOODHOUSE stated the items belonged to MEHTA.  Special Agent Cowart asked WOODHOUSE if MEHTA was at PREMISES II and asked if he could speak with MEHTA about the additional contraband items.

51.    MEHTA was at PREMISES II and met with FTISB Specialists, along with Special Agent Cowart and IOI Investigators in the warehouse where the contraband items were located.  Special Agent Cowart explained to MEHTA why the items were going to be seized as contraband.  Special Agent Cowart asked MEHTA if he had a moment to discuss the seized items and MEHTA agreed to speak with Special Agent Cowart and the IOI Investigators in his office at PREMISES II.

52.    MEHTA stated he had documents relating to all the seized items that he would share with the investigators.  While copying the files onto a removable flash drive, Special Agent

Cowart asked MEHTA about Federal Armament and its associated businesses. MEHTA stated that Federal Armament started off making ammunition and then it eventually evolved into the importation of firearms. MEHTA stated they designed their own weapons systems through reverse engineering. While in MEHTA's office, Special Agent Cowart noticed multiple monitors that displayed multiple CCTV cameras. Special Agent Cowart asked MEHTA whether he watched the cameras all the time. MEHTA stated he had multiple "remote workers" from overseas countries such as Pakistan. MEHTA stated the workers were educated and cost less than American citizens.

53.     Special Agent Cowart asked MEHTA how the different companies were associated with Federal Armament. MEHTA stated that XN Capital was owned 100% by MEHTA. MEHTA further stated that XN Capital was his hedge fund company, which invests in Federal Armament. MEHTA and WOODHOUSE are on the imports license for ATF. MEHTA and MARINE are on the manufacturing license for ATF. MEHTA stated XN Capital was located in New York, but MEHTA had recently moved the company to Cheyenne, Wyoming.

54.     Special Agent Cowart asked MEHTA about the email address "mark@federal armament.com" listed on some of the ATF licensing forms. MEHTA stated that the email address previously belonged to BAILEY, but BAILEY left the company in June 2021. MEHTA stated that Federal Armament previously re-used email addresses, and the above listed email address now belonged to WOODHOUSE. MEHTA provided "c@f-s.us" as his current email address.

55.     MEHTA stated that FSAAP has not done any business yet, but all employees are employed as FSAAP currently. It should be noted that SMITH had previously told IOIs that nothing from Federal Armament had been transferred to FSAAP, but that FSAAP had manufactured AR lower receivers in-house.

**E.** **Additional Facts Establishing Probable Cause as to Export Violations**

56.     As set forth more fully below there is probable cause to believe that Federal Armament, MEHTA and others unknown have provided false information on export forms to include listing a fictitious person, BAILEY, as the contact person on export forms.

**i.** **Statutes and Regulations Relevant to Export Control Violations**

**a)** **Smuggling Goods from the United States (18 U.S.C. § 554)**

57.     Under 18 U.S.C. § 554, it is illegal to smuggle goods from the United States. Pursuant to 18 U.S.C. § 554, "whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both."

**b)** **False Filing of Electronic Export Information (13 U.S.C. § 305)**

58.     Under 13 U.S.C. § 305, it is a crime to file false or misleading electronic export information. The Automated Export System (AES) is the electronic system for collecting Electronic Export Information (EEI) from persons exporting goods from the United States. Pursuant to 13 U.S.C. § 305(a)(l), "any person who knowingly fails to file or knowingly submits false or misleading export information through the [EEI] or the [AES] shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both." In addition, under 13 U.S.C. § 305(a)(2), "any person who knowingly reports any information on or uses the [EEI] or the [AES] to further any illegal activity shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both."

### ii. **Electronic Export Information**

59.     EEI (formerly known as a Shipper's Export Declaration) is used to control exports and is a source document for official U.S. export statistics. The U.S. Department of Commerce, through the Census Bureau's Foreign Trade Division, is the controlling agency for EEI. An EEI must be filed electronically by the U.S. Principal Party in Interest (USPPI), or their U.S. authorized agent. For purposes of filing EEI, the USPPI is the person or legal entity in the United States that receives the primary benefit, monetary or otherwise, from the transaction. The filer is responsible for the truth, accuracy, and completeness of the EEI and all EEI submitted shall be complete, correct, and based on personal knowledge of the facts stated or on information furnished by the parties to the export transaction. An EEI is required for shipments when the value of the commodities exceeds $2,500.00.

60.     An EEI must contain, among other things: name of the USPPI; address from which the goods begin the journey to the port of export; name and address of the ultimate consignee (the ultimate consignee is the person located abroad who receives the export shipment); and the description, quantity and value of the items exported. If an Authorized Agent is used to file on behalf of the USPPI, then the EEI filing must include the name, address, and contact phone number of the agent.

61.     The authorized agent is the person or entity in the United States who is authorized by the USPPI to prepare and file the EEI. EEI must contain, among other things: name of the exporter; address from which the goods begin the journey to the port of export; name and address of the ultimate consignee (the ultimate consignee is the person located abroad who receives the export shipment); and the description, quantity and value of the items exported. The selling price

for goods exported pursuant to sale, and the value to be reported in the EEI, is the USPPI's price to the foreign buyer.

### iii. Electronic Export Information Provided by Federal Armament

62.     Between December 2018 and September 2022, Federal Armament prepared 129 Electronic Export Information (EEI) records with a value of $14 million U.S. dollars. The EEI records listed the export of firearms, firearm parts, and ammunition. BAILEY was listed on the EEI records, Department of State license applications, and Department of Commerce license application as the contact/applicant for Federal Armament. The applications listed BAILEY's contact information as: 631-930-5314 (phone), 914-227-9955 (fax), and (email) mark@fedarm.com.

63.     The export of firearms, parts, and ammunitions exports by Federal Armament, under the direction of control of MEHTA, completed and filed multiple EEIs using the fictitious name "Mark Bailey."

64.     On or about September 10, 2022, during an outbound border search of MEHTA by U.S. Customs and Border Protection (CBP) at Dallas/Fort Worth International Airport, MEHTA stated that he worked for the U.S. Department of Defense (DoD) as an attaché to Pakistan Ordnance Factories (POF) and Turkey. MEHTA further stated that he owned a small arms ammunition manufacturing company. MEHTA stated that he imported small arms for military and law enforcement. MEHTA stated that he was traveling on business for two weeks, spending ten days in Pakistan and four days in Turkey. MEHTA stated that he was traveling with $2,000. MEHTA was permitted to board the outbound flight. Special Agent Marr could not locate any records of MEHTA ever having been employed by the DoD.

65.     On September 22, 2022, CBP conducted an inbound inspection of MEHTA, arriving at Dallas/Fort Worth International Airport from Istanbul, Turkey on Turkish Airlines flight 191, which originated in Islamabad, Pakistan. MEHTA was found to be traveling alone. MEHTA presented his valid U.S. passport for inspection. MEHTA was carrying an Arkansas driver's license. MEHTA was in possession of three business cards: XNFS Funds, which identified MEHTA as Chairman; XN Capital, which identified MEHTA as "Founder & Chief Strategist;" and Federal Armament, which listed the email of mark@fedarm.com as the contact (*i.e.* a reference to "Mark Bailey").

66.     MEHTA volunteered to the CBP Officer that he was refused entry to Turkey. MEHTA provided the documentation from the Turkish Government as to the reason for his inadmissibility into the country of Turkey. MEHTA's recollection of events included him being informed by the Turkish Government that he would not be allowed into Turkey because of information provided by the United States Government. MEHTA stated that he was detained for four hours by Turkish officials.

67.     MEHTA stated that the purpose of his trip to Istanbul, Turkey was to meet with clients to further negotiate weapons deals. MEHTA stated that he was interrogated and questioned about the purpose of his trip by Turkish officials.

68.     MEHTA was asked about the purpose of his travel to Islamabad, Pakistan. MEHTA stated that he traveled to Pakistan to visit the POF.[3] MEHTA stated that he was invited to Pakistan by the Head of Exports and Chairman Salman Bharwana.

---

[3] Open-source research indicates the POF is a conglomerate of fourteen factories engaged in conventional arms production. It is Pakistan's largest defense supplier and is owned and operated by the Pakistan Ministry of Defense.

69. MEHTA stated that he stayed at an Administrative Palace, which is a government owned facility, for most of the days in Pakistan except for one night at the Serena Hotel where he had a villa. Serena Hotel is located at Khayaban-e-Suharwardy, G-5/1., Islamabad, Islamabad Capital Territory 44000.

70. MEHTA stated that he was provided with an armed government escort while in Pakistan for the entirety of his trip. MEHTA stated he was escorted by Pakistan's Inter Services Intelligence (ISI) Chief Protocol Officer to meet with four-star generals and members of the Pakistani Government and Military.[4]

71. MEHTA stated that he was shuttled between different POF sites and had "handlers" from ISI with him for his safety. MEHTA also stated that he was developing business relationships to sell firearms and ammunition with Pakistan's government that would result in sales of millions of dollars.

72. MEHTA was asked to provide any documentation or invitation letter to validate the purpose of his trip. MEHTA stated he did not have any physical paperwork but that he had electronic copies of all documentation on his laptop and could show CBP.

73. MEHTA stated that he directed XN Capital and stated that it was a hedge fund. MEHTA stated he is a technical advisor for FSAAP. He stated that FSAAP would be the company used to work with the POF. MEHTA used technical terms to describe the licensing he must possess to operate under FSAAP. MEHTA stated he has a Type 10 Federal Firearm License. MEHTA stated that it is the hardest and highest license to be obtained for the importation and exportation of firearms. MEHTA stated he also registered with Directorate of Defense Trade Controls (DDTC)

---

[4] The ISI is the Pakistan government's intelligence agency responsible for gathering, processing, and analyzing information related to Pakistan's national security. The ISI is comprised primarily of current military officers from the various branches of the Pakistan Armed Forces.

and was familiar with the International Trafficking in Arms Regulations (ITAR). MEHTA stated that FSAAP regularly exports shipments and they are Customs bonded. MEHTA was asked what countries he does business with to which he replied he works in Europe, Malaysia, and NATO countries.

74. On September 29, 2022, Special Agent Marr completed a certified license history check from DOC, and 22 export licenses were found for Federal Armament from December 2016 through that date.

75. On October 19, 2022, Federal Armament submitted a license application D1299613 to DOC. BAILEY and SMITH were listed on the DOC license application as the contact/applicant for Federal Armament. BAILEY listed a contact phone number of 631-930-5314, a fax number of 914-227-9955, and email address of mark@fedarm.com.

76. On October 19, 2022, Special Agent Marr sent an email to BAILEY using email address mark@fedarm.com to assist Federal Armament's license application and to provide an industry outreach presentation. BAILEY's email sent an automatic reply stating, "This email mark@fedarm.com has gotten too much spam and has been stopped use. Please go to FSAAP contact us page and contact us through the form if you are not a spam robot."

77. On October 20, 2022, a licensing officer (LO) with BIS was unable to contact BAILEY regarding license application D1299613. The LO was able to contact SMITH regarding the errors submitted on DOC's license application D1299613. The LO asked SMITH if BAILEY was available to join the call. SMITH was unable to provide BAILEY's phone number and suggested the LO to contact the corporate office. The LO provided SMITH with DOC's website for information to correctly file the license application.

78.    SMITH stated that Federal Armament employees do not receive export training and SMITH was given a template to complete license applications with DOC and DDTC. SMITH stated he had no knowledge of export regulations and laws.

79.    On November 16, 2022, Special Agent Marr met with SMITH, WOODHOUSE, and MARINE, to discuss the mission of BIS and OEE. Special Agent Marr asked if BAILEY was available for the meeting. SMITH stated BAILEY was not available and was with Federal Armament instead of FSAAP.

80.    Special Agent Marr provided folders to SMITH, WOODHOUSE, and MARINE with documents describing BIS's mission to advance U.S. national security, foreign policy, and economic objectives by ensuring the effective export control and compliance system and promoting continued U.S. strategic technology leadership. Information included activities to include the regulating of export and reexport of sensitive goods and technologies in an effective and efficient manner; enforcing export controls, antiboycott regulations, and public safety laws; cooperating with and assisting other countries on export control and strategic trade issues; assisting U.S. industry to comply with international arms control agreements; and monitoring the availability of the U.S. defense industrial base.

81.    SMITH stated the only countries Federal Armament and FSAAP have exported to were Poland and Pakistan. Special Agent Marr reviewed information from AES and identified shipments to: Canada, Ukraine, Poland, Russia, Indonesia, and Czechoslovakia. SMITH stated Federal Armament manufactures AR-style rifles in the following calibers: 5.56mm; 7.62x39mm; .300; 9mm; and .308.

82.    At the conclusion of the meeting, MARINE gave Special Agent Marr a tour of Federal Armament. Special Agent Marr observed employees assembling firearms and various

calibers of ammunition.  Special Agent Marr also observed equipment for firearms manufacturing, inventory of firearms and parts, and items in shipping and receiving.

83.     SMITH stated BAILEY is a fictitious identity used by MEHTA.  After the meeting with Special Agent Marr on October 12, 2022, SMITH was called into MEHTA's office and was instructed by MEHTA to delete all emails, documents, and files containing the names of BAILEY, MEHTA, and Special Agent Marr.  SMITH may have heard the name BAILEY while working at THOR from Larry Knesck.

84.     On January 11, 2023, Special Agent Marr telephonically recorded an interview with SMITH regarding an email SMITH sent to a Licensing Officer for the Department of Commerce dated on December 28, 2022.  During the telephone interview SMITH stated he met MEHTA in 2011 when both were employed at a firing range and gun club in Van Buren, Arkansas.  SMITH left that employer in 2018 to work for Federal Armament.

85.     MEHTA provided SMITH with $500,000 of firearm products.  SMITH was to sell the product and give the proceeds to METHA, all in exchange for 50% ownership in Federal Armament/FSAAP.  Once SMITH paid MEHTA, MEHTA terminated SMITH from Federal Armament/FSAAP and locked SMITH out from the Federal Armament/FSAAP bank accounts.

86.     SMITH stated MEHTA is depleting inventory, selling items at cost, and terminating employees to reduce overhead with the possibility of moving production to Pakistan.  SMITH stated that MEHTA receives $1.5 million dollars a month from GunBroker.com.

87.     SMITH has been to MEHTA's residence on numerous occasions ranging from office meetings, bachelor parties, political events, and entertaining models.  SMITH stated MEHTA only uses the bedroom, kitchen, and bathroom, and the remainder of the home is spotless.

88.     SMITH stated MEHTA is traveling to the SHOT Show in Las Vegas, Nevada on January 18, 2023, through January 22, 2023. SMITH advised MEHTA will be staying at the Palms Hotel and Casino and traveling with a model named Jessica Copeland of Fayetteville, Arkansas.

89.     SMITH stated contract employees known as "2IC" in Lahore, Pakistan have access to computers and electronic devices, and have the capabilities to delete and wipe computers and electronic devices remotely.

90.     It is Special Agent Marr's experience that individuals violating export control regulations, either working on a profit basis and/or working on behalf of a foreign government, will maintain records online and utilize numerous Internet programs and computers. It is also Special Agent Marr's experience that individuals violating export regulations use the Internet and all Internet instrumentalities, such as business websites, email, and other Internet based programs to conduct their illicit activities. It is common practice for individuals violating export regulations to maintain numerous files on their computers and to maintain records in email and on Internet-based programs for long periods of time. Also based on Special Agent Marr's training and experience, he knows that individuals keep, retain, and maintain their paper records and electronic records for a significant amount of time, particularly when the records relate to business ventures. Specifically, he knows that individuals maintain records of significant purchases and sales to maintain record of the purchase or sale, including contact information and financial information. It is also Special Agent Marr's experience that individuals violating the export regulations consistently violate the law over long periods of time. Due to the complexity of international shipping and the difficulty in conducting international business, violators of the export regulations are meticulous in their efforts and spend a great deal of time and effort to affect their illegal transactions. Further, U.S. export controls laws and regulations require participants in export

transactions to retain records, including electronic records, related to their exports for a period of at least five (5) years from the most recent time of export, reexport, transfer, or termination of the transaction related to the item. (See 15 C.F.R. §§ 762.2(a) and 762.6(a)).

91.     Based on the investigation, Special Agent Marr believes that Federal Armament conducted approximately 129 shipments from December 2016 through September 2022, using "Mark Bailey" on all known EEI records, Department of State license applications, and Department of Commerce license application as the contact/applicant for Federal Armament in violation of U.S. export laws. Special Agent Marr believes Federal Armament did this by using BAILEY instead of MEHTA throughout the scheme and omitting any reference to either party on any export records, all the while knowing that they were the same person with the same company, business addresses, and team members.

92.     In Special Agent Marr's review of various documents, records checks, email communications, and interviews, Special Agent Marr believes that Federal Armament has stored digital communications, shipping records, export documentation, and other related accounting documents on local electronic storage mediums and in hard-copy form located on PREMISES I and II that directly relate to their business with BAILEY as signature authority for Federal Armament. Special Agent Marr believes evidence of the unlawful exports are contained within the electronic storage mediums on the premises. In addition to the electronic storage mediums and based off his training and experience, it is Special Agent Marr's belief that evidence of the unlawful exports are also stored on Federal Armament cellular devices. Based on his training and experience, it is common for both lawful and unlawful international export communications to be conducted on cellular devices using third-party communication applications to discuss logistical and financial information. Lastly, based on his training and experience, it is common practice for

businesses to store and maintain physical records of business dealings and it is Special Agent

Marr's belief that there are physical records of the unlawful exports located on PREMISES I and II.

**F.** **Additional Facts Establishing Probable Cause as to Tax Violations**

93.     Based on the facts set forth in this affidavit, there exists probable cause to believe

that MEHTA violated 26 U.S.C. § 7201 (Attempt to Evade or Defeat the Assessment of a Tax or

Payment Thereof), and 26 U.S.C. § 7206(1) (False Return, Statement, or Document), for the tax

years 2018, 2019, 2020, and 2021.

    **i.**     **Statutes Relevant to Tax Violations**

        **a)**     **26 U.S.C. § 7201 – Attempt to Evade or Defeat Tax**

94.     In relevant part, 26 U.S.C. § 7201 states:

> Any person who willfully attempts in any manner to evade or defeat any tax
> imposed by this title or the payment thereof shall, in addition to other
> penalties provided by law, be guilty of a felony and, upon conviction
> thereof, shall be fined . . . or imprisoned not more than 5 years, or both,
> together with the costs of prosecution.[5]

        **b)**     **26 U.S.C. § 7206(1) – False Return, Statement, or Document**

95.     In relevant part, Title 26 of the U.S. Code states:

> § 7206. **Fraud and false statements**
>
> Any person who –
>
> (1) **Declaration under penalties of perjury. --**
>
> Willfully makes and subscribes any return, statement, or other document,
> which contains or is verified by a written declaration that it is made under

---

[5] For offenses under Sections 7201 and 7206(1), the maximum permissible fine is at least $250,000 for individuals and at least $500,000 for organizations. 18 U.S.C. § 3571(b) & (c). Alternatively, "[i]f any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss." 18 U.S.C. § 3571(d).

the penalties of perjury, and which he does not believe to be true and correct
as to every material matter;

. . .

shall be guilty of a felony and, upon conviction thereof, shall be fined . . .
or imprisoned not more than 3 years, or both, together with the costs of
prosecution.[6]

### ii.    **Investigation Regarding Tax Violations**

96.    On or about April 24, 2014, MEHTA registered Federal Armament with the
Arkansas Secretary of State as a Domestic Limited Liability Corporation. Neither the "General
Partnership" nor the "Limited Partnership" boxes were checked by MEHTA. Federal Armament
has an entity registration date with the IRS in or about April 2014, with XN Capital, LLC, listed
as the sole owner/member. As set up by its owner, Federal Armament has a Form 1065 (U.S.
Return of Partnership Income) filing requirement with IRS. A partnership, defined by 26 U.S.C.
§ 761, includes a syndicate, group, pool, joint venture, or other unincorporated organization
through or by means of which any business, financial operation or venture is carried on..." A
partnership, by definition, is more than one person or entity. To date, Federal Armament has never
filed any Forms 1065, *or any other separate return*, reporting any of its business activity (gross
receipts/sales, expenses, etc).

97.    XN Capital, LLC, has an entity registration date with the IRS in or about April
2011, with MEHTA listed as the sole owner/member, and a business address of 48 Wall Street,
Floor 11, New York, New York 10005. As a single-member LLC, XN Capital is considered by
law (26 C.F.R. §§ 301.7701-2 and 301.7701-3) to be a "disregarded entity." When determining
what type of entity to create and related tax filing requirements with the IRS, the owner may
effectively choose its own classification. A domestic entity with one member that does not elect

---

[6] See fn. 1, *supra*.

to be taxed as a corporation is considered a disregarded entity and the entity is treated as a sole proprietorship, which would be reported on the owner's Form 1040 (U.S. Individual Income Tax Return), Schedule C (Profit or Loss from Business). MEHTA reports XN Capital on his Form 1040, Schedule C, as a sole proprietorship.

98.     MEHTA is required to report his gross income, and to pay all of the resultant income taxes on his respective personal income tax returns. The Internal Revenue Code (I.R.C.) (Title 26 of the U.S. Code), defines gross income as income from whatever source derived, including (but not limited to) "compensation for services, including fees, commissions, fringe benefits, and similar items," that is not otherwise exempted from taxation. I.R.C. § 61(a)(1). This includes income received from XN Capital and Federal Armament. As set forth more fully below, there is probable cause to believe MEHTA did not accurately report all of the income he received from XN Capital and Federal Armament on his personal federal income tax returns.

99.     As set forth herein, MEHTA is the sole owner of XN Capital, and XN Capital is the sole owner of Federal Armament.

100.     MEHTA reports the activity of XN Capital on his Form 1040, Schedule C. For the tax years 2019, 2020, and 2021, Federal Armament issued a Form 1099-MISC (Miscellaneous/Non-Employee Compensation) to XN Capital for consulting/advisory services performed by MEHTA (XN Capital) for Federal Armament. MEHTA then used these Forms 1099 as the basis for the gross receipts he reported on his Form 1040, Schedule C for XN Capital.



101. Analysis of the bank accounts held by MEHTA, Federal Armament, and XN Capital shows substantial deposits to all of the accounts from the business operations of Federal Armament. To date, no federal tax returns have been filed by Federal Armament for any year. Further, MEHTA's federal tax returns do not report any of the gross receipts or net profit (loss) activity related to Federal Armament. As the sole owner of XN Capital, which is the sole owner of Federal Armament, MEHTA was and is ultimately responsible for reporting the income (loss) of the business operations related to Federal Armament.

102. The total deposits by year show that Federal Armament conducted business and otherwise had filing requirements subsequent to registering the entity. The following table shows the deposits to Federal Armament's bank accounts. The column headed "Mehta – Form 1040 – Schedule C Gross Receipts Reported," shows how Mehta reported the business activity of XN Capital, specifically the gross receipts of the operation of XN Capital. The column headed "Fed Arm Bank Analysis – Deposits less non-taxables" is based upon the bank analysis completed to

date, and shows the business gross receipts (sales) of Federal Armament. These sales figures were not reported separately by Federal Armament, which filed no returns, and are not reported on Mehta's IRS Form 1040, Schedule C.

| Year | | Mehta - Form 1040 - Schedule C Gross Receipts Reported | Fed Arm Bank Analysis - Deposits *less* non-taxables | 1 |
|------|--|--------------------------------------------------------|------------------------------------------------------|---|
| 2018 | | $33,750.00 | $7,602,546.72 | |
| 2019 | | $40,700.00 | $7,387,723.23 | |
| 2020 | | $73,893.00 | $9,727,950.08 | |
| 2021 | | $40,344.00 | $12,509,073.46 | |
| **Totals** | | $188,687.00 | $37,227,293.49 | |

1 Bank account analysis for Arvest Bank accounts ending in: x0376 x2216, x3021, x4492, x0389

103. Below is a schedule of MEHTA's Schedule C Income (loss), Adjusted Gross Income (AGI), Total Tax, Payments Made and the Tax Due or (Refund) on his filed federal income tax returns:

| | Schedule C Net Income (loss) | Adjusted Gross Income (AGI) | Total Tax | | Payments Made | | Tax Due (Refund) |
|------|------------------------------|------------------------------|-----------|---|---------------|---|------------------|
| 2018 | $17,153 | $15,941 | $2,831.00 | 1 | - | | $2,831.00 |
| 2019 | $9,107 | $8,463 | $1,287.00 | | $529.00 | 2 | $758.00 |
| 2020 | $55,389 | $50,245 | $11,288.00 | 3 | - | | $11,275.00 |
| 2021 | ($1,375) | ($1,375) | - | | - | | - |

**Notes**
1 Includes estimated tax penalty of $89
2 $529 payment is Earned Income Credit
3 Includes estimated tax penalty of $13

104. Based on MEHTA's filed federal income tax returns, MEHTA substantially underreported his income from the operations of XN Capital by failing to report the millions of

dollars of business activity of Federal Armament. By failing to report income from Federal Armament, MEHTA's IRS Forms 1040 substantially understated his federal income taxes owed. The reporting of income from all sources includes all of the gross receipts from Federal Armament in the year received (cash basis of accounting) or earned (accrual method of accounting). None of the gross receipts of Federal Armament were reported on any of MEHTA's IRS Forms 1040 for 2018, 2019, 2020 and 2021.

105.    Additionally, MEHTA structured the formation and operations of his companies in a manner designed to conceal and disguise their ownership and control. For instance, MEHTA utilized a fictitious person, BAILEY, as a nominee in various capacities at both XN Capital and Federal Armament. MEHTA used the nominee's name, BAILEY, as both a managing member and tax contact of XN Capital as listed with the Arkansas Secretary of State. MEHTA listed this nominee's email, MARK@FEDARM.COM, as a contact for Federal Armament with the Arkansas Secretary of State.

106.    Also, MEHTA uses various online resources to avoid creating normal and customary business records of transactions. For instance, MEHTA heavily relies upon Skype and other similar online communication methods in an effort to minimize records of his communications. Further, MEHTA employs foreign persons in various functions of his business. In particular, MEHTA stated (in a civil action against the Department of Labor) that he used an accountant out of Pakistan. This individual's job was to remotely manage all of the accounting and human resource related business functions of Federal Armament.

107.    MEHTA uses numerous bank accounts across multiple banking institutions. Based on a review of these accounts and the corresponding banking activity, MEHTA conducts business transactions in an effort to confuse ownership and control. MEHTA uses cashier's checks to

conduct transactions instead of checks drawn on his businesses (requiring an authorized signature), including to facilitate payroll checks. MEHTA emailed or otherwise communicated names and amounts constituting weekly payroll to Arvest Bank employees. The bank would then initiate an account withdrawal slip for the total payroll that week. In place of the customer's signature, the bank would write "per Neil," "per Neil Mehta," "per customer Fed Arm" and similar variations. Cashier's checks were then prepared by the bank for the Federal Armament employees in the prescribed amounts per MEHTA. Bank employees were the authorized signers for the bank's cashier's checks. At times, MEHTA also uses another nominee, WOODHOUSE, to sign payroll checks. MEHTA also avoids normal business transaction records by calling his banks to conduct transactions over the phone. By doing so, MEHTA avoids signing documents authorizing withdrawals and transfers of funds from Federal Armament accounts.

108. Further, MEHTA does not own any of the real property associated with his residence and business locations. MEHTA's mother is the nominal owner of the residence identified as PREMISES I. An entity nominally owned by MEHTA's mother, Midwest Land Development, LLC, owns the business location identified as PREMISES II. MEHTA's use of nominees adds another layer of anonymity as to ownership of both his personal and business assets—most particularly, XN Capital and Federal Armament.

109. MEHTA was deposed by the U.S. Department of Labor on December 14, 2021. During this deposition, MEHTA stated that he primarily works from his residence (PREMISES I). MEHTA stated that he worked from home the majority of the time from 2016 up to the day of his deposition. MEHTA also stated that he traveled to the business location (PREMISES II) at least once a week.

110.    As both a Special Agent with IRS-CI and a Revenue Agent with IRS Exam, Special

Agent Munns gained knowledge and experience regarding the manner in which individuals and

related organizations involved in major fraud schemes conduct their criminal activities and attempt

to hide their ill-gotten gain via money laundering and/or related tax violations.    Special Agent

Munns is familiar with Internal Revenue Code requirements regarding the filing of tax returns and

the proper reporting of income and expenses received in connection with a trade or business,

whether legal or illegal.    Special Agent Munns knows:

      a.    In the normal operation of a business, records are created.  Business records
are vital to the day-to-day operations and for the preparation of accurate tax returns and for
audit purposes.  These records are typically kept at business locations and the residences
of the owners.

      b.    Personal financial records include check registers, checks, titles, loan
records, savings passbooks, bank statements, credit card statements and documents
resulting from financial transactions.

      c.    Individuals involved in tax fraud activities oftentimes fail to report all of the
sources of taxable income derived from their businesses.  In order for the business owner
to conceal and hide sources of taxable income, books and records are sometimes falsified
to cover up their actions.

      d.    In order to accurately reconstruct the financial histories of taxpayers and
their various businesses, all forms of business and personal records are required.

      e.    Business owners/operators who are engaged in fraud and/or tax evasion
activities oftentimes maintain a record of their "actual" income and "actual" expense
figures.

f.        Individuals involved in business-related crimes conduct financial transactions in a manner to avoid law enforcement detection. Persons involved in tax crimes often exchange currency for various types of monetary instruments, including postal money orders, and bank cashier's checks, in an attempt to disguise and conceal their true business and personal affairs. These surreptitious transactions do not always occur in the year the currency was removed or concealed from the business.

g.        Persons involved in tax evasion often hide assets by placing those assets in nominee names. However, the titles and deeds to the asset are maintained by the subject and not the nominee owner. The movement, transfer, or sale of these assets does not always occur in the year they were concealed.

h.        Individuals in business may pay employees in cash and other ways to avoid paying the employer's portion of federal employment taxes, workers compensation and other federal, state, and local taxes.

i.        Employers who pay employees in cash make available to the employees the opportunity to underreport their taxable income on personal tax returns because no earnings statements are filed with the IRS.

j.        Individuals engaged in tax evasion activities often structure cash transactions at post offices and banks to avoid cash reporting requirements. Such structuring activities are calculated to thwart the ability of the IRS to accurately determine the tax liabilities of the owners and their various businesses. These transactions do not always occur in the year the income was earned.

G.     **Additional Facts Establishing Probable Cause for Obstruction**

111.     Evidence gathered during the investigation demonstrates that there is probable cause to believe that Federal Armament, MEHTA and/or its owners and/or employees, caused to be produced altered documents, false and misleading information, and willfully made materially false statements in an attempt to obstruct civil litigation seeking to enforce the provisions of the Fair Labor Standards Act (FLSA), filed in the Western District of Arkansas by attorneys of the U.S. Department of Labor, specifically, W.D. Ark. Case No. No. 2:21-cv-02045-PKH.

112.     Further, the investigation has established that there is probable cause to believe that records and evidence relating to such an obstruction are stored and maintained at PREMISES I and II.

i.     **Statutes Relevant to Obstruction**

a)     **18 U.S.C. § 1503 (Omnibus Clause) – Corruptly influencing officer or juror generally**

113.     In relevant part, 18 U.S.C. § 1503 states:

(a)     Whoever corruptly . . . endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, . . . or corruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b).

(b)     The punishment for an offense under this section is. . . (3) in any other case, imprisonment for not more than 10 years, a fine under this title, or both.

b)     **U.S.C. § 1512(c) – Corruptly tampering with a witness, victim, or an informant**

114.     In relevant part, 18 U.S.C. § 1512 states:

(c)    Whoever corruptly—
(1)    alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
(2)    otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

## ii.    <u>Investigation Regarding Obstruction</u>

115.    Information received from the U.S. Department of Labor's Wage and Hour Division and Solicitor's Office shows that Federal Armament operates a business at PREMISES II. Further, the Arkansas Department of Workforce Services (ADWS) has information showing employer unemployment taxes are being paid for an employer located at the PREMISES II in the name of FSAAP and formerly Federal Armament.

116.    The Fair Labor Standards Act (FLSA) of 1938, 29 U.S.C. §§ 201, et. seq., establishes minimum wage, overtime pay, record keeping, and child labor standards affecting full-time and part-time workers in the private sector and in the federal, state, and local governments.

117.    The Wage and Hour Division of the U.S. Department of Labor administers and enforces the FLSA for private employment, State and local government, and Federal employees. An employer is any person acting directly or indirectly in the interest of an employer in relation to an employee for purposes of the FLSA.

118.    Employee means any individual employed by an employer. Non-tipped employees are required to be paid at least the federal minimum wage of $7.25 per hour for all hours up to 40 in a workweek. Overtime must be paid at a rate of at least one and one-half times the employee's regular rate of pay for each hour worked in a workweek in excess of 40-hours per week. The FLSA requires employers to keep records on wages, hours, and other items as specified in the U.S. Department of Labor records-keeping regulations. Most of the information is the kind of

information that is generally maintained by employers in ordinary business practices and in compliance with other laws and regulations. The records do not have to be kept in any particular form and time clocks need not be used. With respect to an employee subject to the minimum wage provisions or both the minimum wage and overtime pay provisions, the following records must be kept:

      a.  personal information including the employee's name, home address, occupation, sex, and birth date if under 19 years of age;

      b.  hour and day when workweek begins;

      c.  total hours worked each workday and each workweek;

      d.  total daily or weekly straight-time earnings;

      e.  regular hourly pay rate for any week when overtime is worked;

      f.  total overtime pay for the workweek;

      g.  deductions from or additions to wages;

      h.  total wages paid each pay period; and

      i.  date of payment and pay period covered.

119.    On or about February 26, 2021, the U.S. Department of Labor, through the Solicitor's Office, brought a civil complaint against Federal Armament, LLC, and MEHTA, individually, for violating the provisions of Sections 7, 11(c), 15(c)(2), and 15(a)(5) of FLSA, as amended, 29 U.S.C. §§ 201, et seq., and to restrain Federal Armament/ MEHTA from withholding payment of overtime compensation found by the Court to be due employees under the Act, and an equal amount as liquidated damages due to the employees. This civil action was filed as, "Martin F. Walsh, Secretary of Labor, United States Department of Labor (Plaintiff) v. Federal Armament, LLC and Neil Mehta, Individually (Defendants)," Civil Action No.: 2:21-cv-02045-PKH, which

was filed in the Western District of Arkansas on or about February 26, 2021.[7] Federal Armament, under the control of MEHTA, was an Arkansas Corporation with a place of business and doing business in Sebastian County, 5730 North 6th Street, Fort Smith, Arkansas 72904, and elsewhere.

120.    The U.S. Department of Labor Solicitor's Office established that Federal Armament originated in 2014 and was a privately owned company, owned by MEHTA. Federal Armament has a Federal Tax ID number ███ 5472.

121.    Federal Armament maintained approximately 21 employees during 2020, with an average payroll of $135,000 per quarter.

122.    In 2021, Federal Armament reported an average of 22 employees for the year and an average of $166,000 in quarterly wages.

123.    On December 14, 2021, during a deposition of MEHTA by the U.S. Department of Labor's Solicitor's Office, MEHTA claimed that he does not own Federal Armament and serves as an advisor/contractor. MEHTA described his employment as "self-employed" in "futures commodity trading" and "Demilitarization, ammunition trade." MEHTA identified XN Capital as his business name.

124.    MEHTA stated he had several offices located in various places, but works primarily at his home office, located at PREMISES I and the business, PREMISES II.

125.    MEHTA was also asked about the "mandatory 15-minute breaks" Federal Armament required its employees to take during the deposition. MEHTA responded that the breaks were 20-minute breaks. According to the U.S. Department of Labor's Solicitor's Office, the time discrepancy is important because regulations allow the employer to deduct for breaks greater than

---

[7] Pursuant to Federal Rule of Civil Procedure 25(d), Martin J. Walsh, Secretary of Labor, is automatically substituted as a party for the former Acting Secretary of Labor, Milton Al Stewart, who was identified as the original party.

20 minutes, but for breaks shorter than 20 minutes, the employee must be paid for that break time. MEHTA added that the 20-minute break might be in the Employee Handbook.

126.　Also, during the deposition MEHTA stated, "I would ask you to probably reference their handbook. I think this was turned over to the Department of Labor," when asked about the hiring process at Federal Armament.

127.　When asked if employees took breaks, MEHTA responded by saying, "From the case material, yes. I mean, even before the case material I -- yes, I know that they took breaks...Over 20 minutes in nearly all cases if not all."

128.　When questioned about the length of breaks being 20-minute breaks, MEHTA stated, "If they were such -- based on what I read in the handbook which -- and the signature page of the handbook the company would allow me to take over those. I know it's actually -- I think it fell down to the managers whatever they enforced them...Based on the handbook and the revision I saw that was turned in I'm -- I'm trying to think because how -- I had to answer how they would go so far over the breaks because my direct knowledge of the issue is that the breaks were an hour – hour and a half, two hours plus."

129.　MEHTA was also asked about how the employees were notified that it was time to take a break, to which MEHTA responded, "Based on what I would recollect, which I had to reference the handbook, it should – it would be at a fixed time at like 10:00 or 2:00 or some interval between lunch."

130.　MEHTA was further questioned about the distinct amount of time employees were allotted for breaks. MEHTA stated, "I assumed it would be 20 plus minutes...based on me pulling up the handbook copies." MEHTA also stated the current handbook states 20-minute breaks and as far as he knows, it's always stated 20-minutes including in 2016. MEHTA also stated, "I

remember if I recollect correctly there was an unapproved copy that tried to say 15 but it was never permitted that way. It was always 20 plus."

131.    When asked who implemented the policy that informed employees to take 15-minute breaks, MEHTA responded by saying, "It would be either of the shift managers…As far as I know he's always saying 20. Unless if he read the wrong copy of the handbook one day and said 15."

132.    MEHTA continued by stating that the shift managers "run the floor and they can change the breaks." MEHTA added, "But if someone is going to change the handbook, it's going to be Manish Jindal and his remote team that does the payroll or it's going to be any of the outside counsel that writes our handbook."

133.    Federal Armament notified the State of Arkansas, ADWS, on or about December 31, 2021, that it was terminating its account because they were bought by FSAAP.

134.    FSAAP filed with the State of Arkansas, ADWS, a liability date of ownership starting on January 1, 2022. FSAAP has maintained approximately 19 employees for 2022 with an average quarterly wage payments of $146,000.

135.    MEHTA was the corporate representative of Federal Armament during the initial Wage Hour investigation, and he has acted, directly and indirectly, in the interest of Federal Armament in relation to its employees.

136.    The U.S. Department of Labor claimed MEHTA made the hiring, firing, and employee pay decisions for Federal Armament at the facility, and further alleged that:

> a. During the period of March 25, 2016 through at least March 25, 2019, Federal Armament and MEHTA willfully violated the provisions of sections 7 and 15(a)(2) of the FLSA, 29 U.S.C. §§ 207 and 215(a)(2), by employing employees for more than 40-hours in a workweek without compensating such employees for their employment in excess of 40-hours per week at rates not less than one and one-half times the regular rates at which they were employed.

b. Federal Armament and MEHTA violated the FLSA's overtime provisions by paying straight time for all hours worked to certain employees, and also by deducting 30 minutes a day for two 15-minute breaks from the employees' timecards.

c. During the period of March 25, 2016 through at least March 25, 2019, Federal Armament/MEHTA violated the provisions of Sections 11(c) and 15(a)(5) of the Act, 29 U.S.C. §§ 211(c) and 215(a)(5), in that they failed to make, keep, and preserve adequate and accurate records of their employees and the wages, hours, and other conditions and practices of employment maintained by them as prescribed by regulations duly issued pursuant to authority granted in the FLSA and found in 29 C.F.R. Part 516.

d. Federal Armament and MEHTA records failed to record premium pay for overtime hours when overtime hours were worked, and instead designated the overtime pay due as a bonus, which was paid as straight time. In addition, Federal Armament and MEHTA also failed to properly record all hours worked by their employees when they improperly deducted compensable time taken for rest breaks from the employees' time cards.

e. Federal Armament and MEHTA's violations of the FLSA were willful in that they knew or should have known that certain employees were not being paid proper overtime compensation for hours worked over 40 in a workweek. Specifically, Federal Armament and MEHTA had certain employees sign an agreement that stated that these employees were to be paid their hourly rate for "however many hours are worked with a required weekly total of 50 hours."

f. The agreement also contained a provision, which stated that if the Department of Labor took issue with this method of payment, the employee's payroll records would be edited to reflect that no overtime was worked. These actions demonstrate that Federal Armament/MEHTA willfully violated the Act.

137. On March 17, 2022, the U.S. Department of Labor's Solicitor's Office sent the fourth set of "Requests for Production of Documents" to Federal Armament/MEHTA. In part, the U.S. Department of Labor's Solicitor's Office requested that they produce, "any documents, including but not limited to employee handbooks, memorandums, or policies relating to the breaks employees were required to take during their work shift at Federal Armament." This request was limited to documents that were in effect March 2016 through March 2019.

138. On April 21, 2022, Federal Armament/MEHTA responded to the above request by producing two electronic handbooks, Revision F (dated 1/1/2016) and Revision G (dated 1/1/2019). Both of these handbooks had a provision under "Breaks" stating that "Employees are entitled to two unpaid 20-minute snack/drink/cooldown breaks…"

139. After the U.S. Department of Labor's Solicitor's Office received these handbooks, the U.S. Department of Labor's Solicitor's Office contacted a U.S. Department of Labor Wage and Hour Division investigator, and requested the Wage and Hour Division to re-contact employees that were interviewed during the initial the U.S. Department of Labor's Wage and Hour Division investigation. The purpose of the re-contact was to see if any of them had a copy of the employee handbook.

140. One of the Federal Armament employees, had a copy of the handbook and forwarded it to the U.S. Department of Labor's Solicitor's Office E. The employee handbook provided by the former employee was titled, "Employee and Company Handbook, Revision F." In the "Break" section of that handbook, it stated that, "Employees are entitled to an unpaid 15-minute break for rest twice each day."

141. The U.S. Department of Labor's Solicitor's Office compared the two handbooks labelled Revision F. The U.S. Department of Labor's Solicitor's Office noticed that the signature page from the Revision F handbook that Federal Armament/MEHTA produced was on page 22, and that the signature page from the Revision F handbook that the former employee provided was on page 21.

142. The U.S. Department of Labor's Solicitor's Office noted that page 21 was missing from the employee provided handbook because it was signed by the employee and given back to

Federal Armament as an acknowledgement certifying the employee read and understood the handbook contents.

143. The U.S. Department of Labor's Solicitor's Office then went through several of the individual personnel files provided during discovery and found that every one of the employee signature pages in the employees' personnel files was page 21 of the handbook.

144. The U.S. Department of Labor's Solicitor's Office intent during the civil litigation was to argue that prior to production of the two employee handbooks, Federal Armament/MEHTA changed the amount of time allowed for breaks and added additional sentences to that provision, which moved everything down, including the signature pages.

145. The employee's provided employee handbook "Break" section contained only 3-sentences, while the handbook produced by Federal Armament / MEHTA contained 12-sentences.

146. The U.S. Department of Labor's Solicitor's Office contacted their IT to see if they could determine if the document had been altered and when, but they were unable to make that determination because the document was not in its native format.

147. The U.S. Department of Labor's Solicitor's Office has not altered the handbooks, nor their saved as "names" sent to the U.S. Department of Labor from Federal Armament/MEHTA counsel.

148. The U.S. Department of Labor's Solicitor's Office has the original handbook sent to them from the employee.

149. The U.S. Department of Labor's Solicitor's Office also took a few employee depositions and they all stated that the breaks were 15-minutes; however, none of them could remember seeing anything about the breaks in writing.

150.     On or about June 1, 2022, the U.S. Department of Labor filed a "Motion to Compel Documents." The specific documents and discovery deficiencies at issue in this motion to compel are the following:

    a.  Request for Production (RFP) No. 7 – all documents that show the hours worked by each employee during each workweek from March 2016 to present;

    b.  RFP No. 8 – all documents that show the amounts paid to each employee of Federal Armament during each workweek from March 2016 to present;

    c.  RFP No. 15 – complete personnel files for all employees relating to employment and/or work performed on behalf of Federal Armament from March 2016 through the present;

    d.  RFP No. 19 – all payroll ledgers, all timecards (including the gloss carton-stock timecards and the RFID timecards), all employee time records, and all calculations of payroll and compensation for all employees that worked at any time for Federal Armament, from March 2016, to the present;

    e.  RFP No. 20 – all documents that reflect the hours worked by each and every employee of Federal Armament during each workweek during the period from March 2016, to the present; and

    f.  RFP No. 24 - all agreements relating to an employee's agreement to be paid at a base rate for however many hours are worked."

151.     The U.S. Department of Labor's Solicitor's Office made repeated good faith efforts to resolve the discovery issues prior to filing this motion to compel.

152.     The U.S. Department of Labor's Solicitor's Office conferred with Federal Armament/MEHTA counsel, in person, by telephone, and through multiple e-mails in efforts to resolve the discovery issues.

153.     The U.S. Department of Labor's Solicitor's Office traveled to Fort Smith on March 10, 2022, at a prearranged time and date, to review the time and payroll records, but MEHTA's counsel was unable to obtain the records from the time clock provided by Federal Armament and

MEHTA. According to the Solicitor's Office Federal Armament and MEHTA were either unable or unwilling to assist their counsel in obtaining the time and payroll records.

154.     On March 10, 2022, the U.S. Department of Labor made arrangements with Federal Armament's counsel to meet in Fort Smith, Arkansas to review documents responsive to our discovery requests. Federal Armament counsel stated that the U.S. Department of Labor's Solicitor's Office could review the documents at a Federal Armament warehouse located at 21st and P Street, in Fort Smith.

155.     The U.S. Department of Labor's Solicitor's Office went to the warehouse and met with Federal Armament Counsel and an employee of Federal Armament. The Federal Armament employee opened up the warehouse and retrieved one or two boxes from his truck for the U.S. Department of Labor's Solicitor's Office to review. The boxes contained the actual time clock cards used by employees to clock in and clock out. The Federal Armament employee also brought the actual time clock, which was supposed to contain the other time clock records requested in the requests for documents. The time clock reportedly contained electronic information that the U.S. Department of Labor could download onto a thumb drive or hard drive. After several attempts, the Solicitor's Office was unable to download any readable documents from the time clock. The review of the documents and the attempts to download documents from the time clock was all done inside the warehouse at that location.

156.     The U.S. Department of Labor's Solicitor's Office employee was not able to see much in the warehouse because it was dark, but did see shell casings on the ground, and there were pallets all over the warehouse containing several boxes on each pallet. The U.S. Department of Labor's Solicitor's Office employee is not sure of the contents, but assumed they were casings

based on the casings on the floor around these pallets. There were no other employees at this warehouse.

157.    After the March 10, 2022, trip to Arkansas, for the U.S. Department of Labor's Solicitor's Office, a telephone conference with the court was conducted, pursuant to the court's scheduling order, to see if the lack of discovery being provided by Federal Armament and MEHTA could be resolved without motion practice.

158.    This teleconference took place on March 24, 2022. At the conclusion of that teleconference, the court advised Federal Armament/MEHTA to produce the requested documents to the U.S. Department of Labor immediately, as they were relevant in this matter.

159.    Federal Armament's counsel stated that he would instruct MEHTA of the judge's advice and that the documents would be produced the following week. The following is an account of the parties' discussions pertaining to the production of the requested documents after the teleconference with the Court:

    a. March 30, 2022 – MEHTA's counsel telephoned the U.S. Department of Labor's Solicitor's Office to inform him that he has not been able to obtain the time clock reports from the time clock provided by the Federal Armament and MEHTA, and that Federal Armament and MEHTA are willing to send the time clock to the U.S. Department of Labor's Solicitor's Office to see if they can retrieve the time clock reports from the time clock. The U.S. Department of Labor's Solicitor's Office apprehensively agreed to try to obtain the documents from the time clock.

    b. March 31, 2022 – The U.S. Department of Labor's Solicitor's Office sent an email to Federal Armament counsel to advise him, Federal Armament, and MEHTA that the U.S. Department of Labor's Solicitor's Office would not attempt to retrieve the requested documents from the time clock, and that it was Federal Armament's responsibility to obtain and produce the requested time records. The U.S. Department of Labor's Solicitor's Office also requested that all responsive documents be produced no later than close of business on April 8, 2022.

    c. The U.S. Department of Labor's Solicitor's Office stated in an email on March 31, 2022, "Further, I know we only discussed the time clock documents, but

I'm concerned that the other documents (emails, employee handbooks, policies, paystubs, etc.) have not been produced. Please inform your client that the judge ordered all of the documents requested, not just the time clock reports, be produced immediately. I am asking that your client produce all responsive documents no later than close of business on Friday, April 8, 2002."

d. April 8, 2022 – Federal Armament counsel responded to the March 31, 2022 email stating that the documents we are requesting would take a number of weeks to produce. Federal Armament counsel again offered to make the time clock available to the U.S. Department of Labor's Solicitor's Office to obtain the requested documents. Federal Armament counsel also responded "You mentioned the employee handbook. You should have that document in your records already from previous production. If you do not, please advise, but I believe this is a document which you already have."

e. April 12, 2022 – the U.S. Department of Labor's Solicitor's Office telephoned Federal Armament counsel to inform him that offer to provide the time clock was declined, and that it was Federal Armament/MEHTA's responsibility to produce the documents requested.

f. April 21, 2022 – Federal Armament counsel sent an email to the U.S. Department of Labor's Solicitor's Office allegedly containing documents responsive to the U.S. Department of Labor's Solicitor's Office document request.

g. April 22, 2022 – After a review of the documents produced, the U.S. Department of Labor's Solicitor's Office telephoned Federal Armament counsel to inform him that the time clock records produced were not in the format requested and agreed upon. The time clock records produced contained the punch-in and punch-out time for the employees but did not calculate the total number of hours that employee worked per week, as opposed to the format of the report produced during the Wage and Hour investigation. Federal Armament counsel stated that he would talk to his client to see if they could produce the payroll records in the agreed upon format.

h. April 25, 2022 – The U.S. Department of Labor's Solicitor's Office sent an email to Federal Armament counsel to inform him that upon further review of the documents produced, the production is incomplete. Exhibit A of the Complaint contains the names of 167 employees alleged to be owed back wages. The documents produced contain punch-in/punch-out records for only 85 employees. In addition, the document requests sought the time clock reports for the time period from March 2016 thru the present. However, the documents produced only cover the time period from December 2017 thru March 31, 2019.

160.     On or about September 27, 2022, a "Brief in Support of Motion for Summary Judgement by MEHTA" was filed.  In part, and as it relates to hours worked by employees, breaks, and understanding of standard operation procedures, as well as employee handbooks, the filing stated the following:

      a.  Concerning hours worked, MEHTA testified that the shift managers had the authority to set the hours worked by the employees on each shift.

      b.  The managers had the authority to enforce the amount of time the employees spent on breaks.

      c.  A manager would be the person who would notify employees when a break was over and it was time to get back to work.

      d.  Any change to the employee handbook, on break times or other topics, would be done by an employee named Jindall or outside counsel.

      e.  When there were issues concerning employee breaks, disciplinary sanctions were imposed by an employee named Jory Johnson, not MEHTA.

      f.  MEHTA did not know whether those employees were given any prior warning because that was "an H.R. decision which I don't manage" as stated by MEHTA.

      g.  MEHTA specifically did not advise on payroll or administrative law matters.

161.     It is Senior Special Agent Griffitt's experience and training that individuals endeavoring to influence, intimidate, or impede the due administration of justice as well as individuals who alter, destroy, mutilate or conceal a record, document, or other object, or attempt to do so, with the intent to impair the object's integrity or availability for use in an official proceeding, will maintain physical copies of records as well as maintain similar records online through the utilization of numerous Internet programs and computers, which are believed to be located at PREMISES I and II.  It is also Senior Special Agent Griffitt's experience that individuals violating these regulations use the Internet and all Internet instrumentalities, such as business websites, email, and other Internet based programs to conduct their illicit activities.  It is common

practice for individuals obstructing the administration of justice to maintain numerous files on their computers and to maintain records in email and on Internet-based programs for long periods of time. Based on Senior Special Agent Griffitt's training and experience, he knows that individuals keep, retain, and maintain their paper records and electronic records for a significant amount of time, particularly when the records relate directly to business operations. Specifically, he knows that individuals maintain records of business practices, employee handbooks, employee training certifications and training documents, standard operation procedures, as well as both hard-copy records and electronic records establishing actual hours worked and times deducted from actual payments to employees. These records historically include contact information, payment information, deductions, and certification information. Based on training and experience, Senior Special Agent Griffitt is aware that individuals will maintain both the original copies of documents and altered forms of the original versions as well as evidence that of the alterations, including, but not limited to, different alteration drafts, communications about the alterations and fabrications of the data that is provided to the U.S. Department of Labor.

162.    In Senior Special Agent Griffitt's review of various documents, records checks, email communications, and interviews conducted by others, Senior Special Agent Griffitt believes that Federal Armament and MEHTA have original, copies, and electronic versions of records consisting of business practices, employee handbooks, employee training certifications and training documents, standard operation procedures, including contact information and certification information. Senior Special Agent Griffitt also believes that Federal Armament has stored digital communications, electronic records, and other related documents on local electronic storage mediums and in hard-copy form located on PREMISES I and II that directly relate to their business practice regarding employee pay, break times, and unpaid hours associated with employees

including, but not limited to, absences, leave, short-breaks and extended breaks. Senior Special Agent Griffitt believes evidence of the unlawful acts of not paying individuals for breaks as well as alterations to previous policies after the fact are contained within the electronic storage mediums on the PREMISES I and II and stored in hard-copy physical copies.

163.  In addition to hard-copy/physical copies and the electronic storage mediums and based off his training and experience, it is Senior Special Agent Griffitt's belief that evidence of persons endeavoring to influence, intimidate, or impede the due administration of justice as well as individuals who alter, destroy, mutilate or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding of are also stored on Federal Armament cellular devices.

164.  Based on Senior Special Agent Griffitt's training and experience, it is further common for both lawful and unlawful business communications to be conducted on cellular devices using third-party communication applications to discuss logistical, procedural and policy and financial information.

### III.  LOCATIONS TO BE SEARCHED

165.  Based on my training and experience, the training and experience of other agents assisting with this joint investigation and, the facts and opinion set forth in this affidavit, I believe there is probable cause to search:

a.  PREMISES I is the residence of MEHTA located at 6999 Free Ferry Road, Fort Smith, Arkansas 72903, including any out-buildings and certain vehicles more fully described in Attachment A, for evidence of violations of law as more fully described in Attachment B.  In addition to living at PREMISES I, there is probable cause to believe that MEHTA both lives and works at PREMISES I.  MEHTA was deposed by the U.S. Department of Labor on December 14,

2021. During this deposition, MEHTA stated that he primarily works from his residence (PREMISES I). MEHTA stated that he worked from home the majority of the time from 2016 up to the day of his deposition. MEHTA also stated that he traveled to the Federal Armament business location (PREMISES II) at least once a week. For this reason, there is probable cause to believe that PREMISES I will contain records and communications related to MEHTA's ownership, control and operation of his businesses including Federal Armament as well as records and communications relating to his personal finances.

b. PREMISES II is the main business location of Federal Armament located at 5730 North 6th Street, Fort Smith, Arkansas 72904 including any out-buildings and certain vehicles more fully described in Attachment A, as for evidence of violations of law as more fully described in Attachment B. PREMISES II is the location where the 3,171 unlawfully imported and contraband firearms are located. As the main location where Federal Armament conducts its business, there is probable cause to believe that business records and communications related to the ownership, operation and finances of Federal Armament including records related to the importation of firearms and the exportation of merchandise by Federal Armament will be located.

166. Because records and other things specified in Attachment B are commonly stored in outbuildings, the Attachment A for both PREMISES includes all outbuildings located upon the properties. Because many of the items specified in Attachment B are portable and commonly transported between home and work, the Attachment A for both PREMISES includes all vehicles located upon the properties that are owned or used by MEHTA, WOODHOUSE, MARINE, Federal Armament, XN Capital, and FSAAP.

167. Your affiant believes there exists evidence of the violations of law contained within the electronic storage mediums and hard copy documents on PREMISES I and II. Based on my

training and experience, it is common practice for businesses to store and maintain digital and physical records of business dealings and it is my belief that there are digital and physical records of the unlawful conduct located on PREMISES I and II.

## IV. **ITEMS TO BE SEIZED**

168.    The items to be seized are the evidence, fruits, and instrumentalities of the following criminal offenses and items subject to forfeiture as proceeds of or involved in the following criminal offenses:  Unlawful Importation of Firearms in violation of 18 U.S.C. § 922(l); Unlawful Exportation of  Merchandise in violation of 18 U.S.C.  § 554; Submitting False or Misleading Export Information through the Automated Export System (AES) for collecting Electronic Export Information (EEI), in violation of 13 U.S.C. § 305(a)(l); Attempt to Evade or Defeat Tax, in violation of 26  U.S.C. § 7201; False Return, Statement or Document, in violation of 26  U.S.C. § 7206(1); Corruptly Obstructing or Impeding the Due Administration of Justice, in violation of 18  U.S.C. § 1503; Corruptly Altering, Destroying or Concealing a Record, Document, or other Object with Intent to Impair the Objects' Integrity or Availability for Any Official Proceeding, in violation of 18  U.S.C. § 1512(c); and Conspiring to Commit an Offense Against the United States or to Defraud the United States, in violation of 18  U.S.C. § 371.; (the "Subject Offenses"), as described in Attachment B, which is incorporated herein by reference.

## V.    **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[8]

169.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

170.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

171.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the

---

[8] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

172.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

173.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

174.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the PREMISES for a number of reasons, including the following:

    a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.      Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

175.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.      Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.      In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.      Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Federal Armament employees' thumb and/or fingers on the

device(s); and (2) hold the device(s) in front of Federal Armament employees' face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

176. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI.  CONCLUSION

177. For all the reasons described above, there is probable cause to believe that Federal Armament, its owners, and its employees violated the "Subject Offenses."

178. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on the PREMISES as described in Attachment A.

## VII.  REQUEST FOR SEALING

179. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

George Handey
Special Agent
U.S. Department of Justice
Federal Bureau of Investigation


Subscribed and sworn to before me on January 27 , 2023, at 2:00 p.m. , in Fort Smith, Arkansas.

HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## Location to be searched:
## PREMISES I

**ADDRESS:**   6999 Free Ferry Road, Fort Smith, Arkansas  72903

**DESCRIPTION:**  Single family residence at the corner Free Ferry Road and Free Ferry North, having a portico, a horseshoe-shaped driveway, and a detached building on the right side of the property.  To include:  all exterior structures, buildings, detachments, and vehicles located thereupon owned or used by Neil Ravi Mehta, Federal Armament LLC, XN Capital LLC, FSAAP LLC, XNFS INC, Eric Woodhouse, or Winifred Marine.





## ATTACHMENT B

## PARTICULAR THINGS TO BE SEARCHED FOR, SEIZED AND SEARCHED

### PREMISES I:  6999 Free Ferry Road, Fort Smith, Arkansas 72903

1.      Evidence, fruits, and instrumentalities of violations of, attempts to violate and conspiracy to violate 18 U.S.C. § 922(l) (Unlawful Importation of Firearms); 18 U.S.C. § 554 (Unlawful Exportation of Merchandise); 13 U.S.C. § 305(a)(l) (Submitting False or Misleading Export Information through the Automated Export System (AES) for collecting Electronic Export Information (EEI)); 26 U.S.C. § 7201 (Attempt to Evade or Defeat Tax); 26 U.S.C. § 7206(1) (False Return, Statement or Document); 18  U.S.C. § 1503 (Corruptly Obstructing or Impeding the Due Administration of Justice); and 18  U.S.C. § 1512(c) (Corruptly Altering, Destroying or Concealing a Record, Document, or other Object with Intent to Impair the Objects' Integrity or Availability for Any Official Proceeding) (hereinafter collectively referred to as "the Subject Offenses"), from January 1, 2014, to the execution date of the search warrant, in any form (written, printed, magnetic or electronic), including:

   a.      All records, data, and/or communications reflecting or relating to ownership current and historical of Federal Armament LLC, XN Capital LLC, FSAAP LLC, XNFS INC, or associated businesses organized, operated, and created by MEHTA (hereinafter, "Federal Armament and associated entities").

   b.      All records, data, and/or communications reflecting or relating to employee records, including, but not limited to, hiring documents, contracts, agreements, acknowledgements, discipline, termination documents, training, certifications, etc.

c.    All records, data, and/or communications reflecting or relating to payments made to Neil MEHTA, Mark BAILEY, and employees of Federal Armament and associated entities.

d.    All records, data, and/or communications reflecting or relating to Federal Armament and associated entities and/or their officers, employees, contractors, accomplices, and/or facilitators, commission of or intent to commit violations of Subject Offenses.

e.    Any evidence supporting or displaying, records, data, and/or communications regarding standard operating procedures, employee handbooks, employee training certifications and training documents.

f.    All records, data, and/or communications reflecting or relating to the shipment or potential shipment of goods or technology, from the United States, directly or indirectly, to Federal Armament and associated entities.

g.    All records, data, and/or communications reflecting or relating to the shipment or potential shipment of goods or technology, from the United States, directly or indirectly to Federal Armament and associated entities.

h.    All records, data, and/or communications reflecting or relating to the travel by persons associated with or directed by Federal Armament and associated entities to/from the United States, directly or indirectly related to Federal Armament and associated entities.

i.    All records, data, and/or communications reflecting or relating to knowledge of the Subject Offenses.

j.    All records, data, and/or communications reflecting or relating to compliance or non-compliance with the Subject Offenses.

k.　All records, data, and/or communications identifying aiders, abettors, facilitators, coconspirators, or witnesses.

l.　All records, data, and/or communications reflecting or relating to Federal Armament and/or its officers, employees, contractors, accomplices, and/or facilitators, commission of or intent to commit violations of the Subject Offenses.

m.　All records, data, and/or communications reflecting or relating to the location and travel of Federal Armament and associated entities' officers, employees, contractors, accomplices, and/or facilitators during the relevant time period.

n.　All records, data, and/or communications reflecting or relating to commodity classification of items subject to U.S. controls and the licensing of export to destinations outside the United States. Such evidence, fruits, and instrumentalities that include – but are not limited to – the following (in any form):

　　i.　Contracts, agreements, quotations, purchase orders, invoices, *pro forma* invoices, packing lists, bills of lading, airway bills, Electronic Information ("EEI"), Shipper's Letters of Instruction, and other shipping and import/ documentation;

　　ii.　Facsimile communications, electronic mail ("email") communications, social media messaging, text messages, correspondence, telephone messages, calendars, sale acknowledgments, technical specifications, internal memoranda, notes from meetings and conversations concerning shipment or potential shipment of goods or technology, from the United States, directly or indirectly to other countries;

iii.      Letters of credit, bank drafts, bank statements, and other records of payment concerning any of these completed or contemplated transactions;

iv.      Books of original entry, including but not limited to general, cash receipts, sales, cash disbursements, purchases, payroll and other journals concerning these completed or contemplated transactions;

v.      Contracts, agreements, licenses, or technology control statements related to Federal Armament or other associated entities or other pseudonyms used for Federal Armament locations worldwide.

vi.      General accounts, accounts receivable, accounts payable, and other ledgers of account concerning completed or contemplated transactions.

o.      Any evidence of possession, ownership, custody or control of the target location and/or, any instrumentalities of the criminal offenses.

p.      Company-issued electronic devices, including computers, tablets, electronic storage media, and cellular telephones issued to Federal Armament and associated entities' employees associated with management, shipping, compliance, sales, finance, travel, and product development.

q.      Any items designated to be shipped from Federal Armament and associated entities.

r.      All bookkeeping records and other financial records including general ledger, general journals, all subsidiary ledgers and journals, gross receipts and income records, cash receipts and disbursement records and/or journals, sales and purchase records and/or journals, accounts receivable and payable ledgers and records, bad debt records, cost of goods sold records, loan receivable and payable ledgers, voucher register, and all

sales and expense invoices including all invoices documenting expenses paid by cash (currency) or bank check (cashier or official checks) or money orders, and retained copies of any bank checks (cashier or official checks) or money orders, accounting software files (i.e. QuickBooks, QuickBooks backup files, or similar accounting software).

s. Records and workpapers reflecting the purchase, basis and depreciable life of assets. Records and workpapers of the sale of business assets such records disclosing the dates of purchase and sale, cost and sales price, records establishing or adjusting asset basis.

t. Any and all personnel related files, background checks, employment applications, photocopies of identification documents, including driver's licenses and Social Security cards, timecards, Forms W-2, 1099 or W-4 (whether filed or not), payroll records, work schedules, payroll documents, payroll tax payment information, Forms 940 and 941, supporting workpapers, correspondence with accountants or others related to the preparation, maintenance or filing of any such documents or files.

u. Records and files relating to any and all tax returns prepared, including returns prepared, original and amended, financial statements, copies of original returns filed and prepared previously by another preparer, records used to include books, journals, receipts, invoices, work papers, notes and any other documentation supplied for use in the preparation of tax returns, documents pertaining to tax refunds received.

v. Loan records including applications, financial statements, loan collateral, credit and background investigations required, loan agreement, notes or mortgages, settlement sheets, contracts, retained copies of checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check),

checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loan correspondence files and memoranda relative to these loans.

w.      Any and all documentation regarding communications or correspondence with any current or former: employees, executives, accountants, listed business entity owners, related parties, including electronic mail, memoranda, notes, letters, cellular phone text messages.

x.      Records establishing actual hours worked and times deducted from actual payments to employees, business practices regarding employee pay, break times, and unpaid hours associated with employees including, but not limited to, absences, leave, short-breaks and extended breaks, bonuses, as well as all documents and communications regarding other payment information, deductions, and certification information, including original documents and altered forms of the original versions as well as evidence that of the alterations, including, but not limited to, different altered drafts, communications about the alterations and fabrications of the data that is provided to the U.S. Department of Labor.

y.      Digital devices or forensic copies thereof which may contain evidence falling within the scope of the foregoing categories of items to be seized, including computers, tablets, electronic storage media, and cellular telephones used or possessed by MEHTA or which are used or have been previously used by other individuals to conduct or communicate regarding the business of Federal Armament and associated entities.

z.      With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.        evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

ii.       evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.      evidence of the attachment of other devices;

iv.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.       evidence of the times the device was used;

vi.      applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

vii.     records of or information about Internet Protocol addresses used by the device.

## DEFINITIONS

1. As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

2. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication

devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

1.      In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.      Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.      The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d. If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e. If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

2.     The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3.     During the execution of this search warrant, law enforcement is permitted to: (1) depress Federal Armament employees' thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the employee's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

4.     The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.